**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Ginger Pung,                                               Civil No. 16-6 (DWF/DTS)

          Plaintiff,

v.                                                                    **MEMORANDUM**
                                                                         **OPINION AND ORDER**
Regus Management Group, LLC,[1]
a Delaware limited liability company,

          Defendant.

_____

Evan Weiner, Esq., and John R. Neve, Esq., Neve Webb, PLLC, counsel for Plaintiff.

David S. Shankman, Esq., and Mitchell L. Fraley, Esq., Shankman Leone, P.A., and
Scott E. Korzenowski, Esq., Dady & Gardner, PA, counsel for Defendant.
_____


**INTRODUCTION**

      This matter is before the Court on a Motion for Summary Judgment brought by

Defendant Regus Management Group, LLC ("Defendant" or "Regus") on Plaintiff

Ginger Pung's ("Plaintiff" or "Pung") claims of sexual harassment and reprisal in

violation of 42 U.S.C. § 2000e ("Title VII") and the Minnesota Human Rights Act

("MHRA"), Minn. Stat. § 363A, *et seq.* (Doc. No. 34.) For the reasons set forth below,

the Court grants in part and denies in part the motion.

---

[1]     The parties have agreed that Regus Business Centre, LLC is not a proper party to
the case.

# BACKGROUND[2]

This case involves a consensual workplace relationship that ended and subsequent claims of harassment and retaliation. Plaintiff began working for Regus in 1991 and received consistent positive performance reviews. (Doc. No. 37, Ex. 10 ("Pung Dep.") at 57; Doc. No. 42 ("Weiner Decl.") ¶ 2.) In 2004, Plaintiff began working as a General Manager ("GM") for Regus. Plaintiff worked in that capacity during the time period relevant to this case. (Doc. No. 37, Ex. 22 ("Ravenscroft Dep.") at 29; Pung Dep. at 58.) Regus is in the business of leasing executive office suites. (Doc. No. 37, Ex. 1 ("Bowron Dep.") at 16-17.) As a GM, Plaintiff's primary duties included ensuring client satisfaction, occupancy, profitability, and sales productivity. (Pung Dep. at 57-58.)

In or around 2010 or 2011, Regus Area Director Scott Ravenscroft became Plaintiff's direct supervisor. (Pung Dep. at 58.) In 2012, after Ravenscroft made several advances, Plaintiff and Ravenscroft began a consensual, sexual relationship that continued until early 2014. (*Id.* at 80, 98-104, 112, 115.) In March or April 2014, Plaintiff told Ravenscroft that she wanted to end the relationship. (*Id.* at 114-17, 134-38.) According to Plaintiff, after she ended the relationship, Ravenscroft showed up at Plaintiff's house on a few occasions in an effort to re-start the relationship, but Plaintiff refused. (*Id.*) After Plaintiff ended the relationship, Plaintiff alleges that Ravenscroft's

---

[2]     The facts in this case are numerous and involved. The Court's recitation is not exhaustive of the facts that may be relevant at trial; instead, the Court recites the facts to the extent that they are material to the disposition of the present motion.

behavior toward her at work became "very controlling" and that he treated her worse than
her co-workers. (*Id*. at 139-41.)

On June 4, 2014, Ravenscroft met with Plaintiff and threatened to put her on a
"coaching plan." (*Id*. at 163-65, 321.) Ravenscroft suggested that Plaintiff's "numbers
were lacking" and that Plaintiff had indicated that she wanted to leave Regus, but
Plaintiff disputes both of these assertions. (*Id*. at 154-56, 163-65; Ravenscroft Dep. at
88-90.) On June 9, 2014, Plaintiff reported her prior relationship with Ravenscroft to
Dehne Elliot, Director of Regus Human Resources, complained that Ravenscroft wanted
to put her on a coaching plan, and expressed concern because she understood that
coaching plans had been used by Regus in the past as a premise to terminate an
employee. (Pung Dep. at 169-71.) Plaintiff explained that she thought Ravenscroft was
targeting her because she ended their sexual relationship. (*Id*.)

On June 11, 2014, Elliot interviewed Plaintiff over the phone, during which
Plaintiff complained that Ravenscroft's treatment amounted to retaliation and was
"borderline harassment." (*Id*. at 188-90, 205-06.) Also on June 11, 2014, Plaintiff sent
an e-mail to Elliot, stating: "To be clear Regus is now on record that there was a sexual
relationship between my boss and I that I terminated. As a result, it is my opinion that I
am being retaliated against by coaching leading to termination." (Weiner Decl. ¶ 3,
Edmundson Exs. 36-37.)

On June 23, 2014, Elliot concluded her investigation and was unable to
substantiate whether there had been a sexual relationship between Plaintiff and

Ravenscroft,[3] but she did find that Ravenscroft's behavior had created an appearance of improper conduct.  (Doc. No. 37, Ex. 7 ("Edmondson Dep.") at 67.)  Ravenscroft was given a warning and informed that he would be terminated if the behavior continued. Ravenscroft remained responsible for Plaintiff's day-to-day reporting, but Regus asserts that it moved Plaintiff's performance-related supervision to the Regional Vice President, Jeff Bowron.  (Edmondson Dep. at 47-48.)  Plaintiff, however, asserts that she never reported to Bowron and that she met Bowron only once in-person.  Plaintiff also asserts that she complained again because she felt that Regus had not tried to protect her from further harassment and that she was still reporting directly to Ravenscroft.  Plaintiff alleges that after she complained about Ravenscroft's treatment of her, his treatment of her became worse, making it difficult for her to do her job.  (Pung Dep. at 276, 280-81.) Plaintiff asserts that co-workers noticed Ravenscroft's demeanor toward her—making "harsh" and "demeaning" comments to Plaintiff in e-mails and calling her questions "stupid" during conference calls.  (*See, e.g.*, Weiner Decl. ¶ 5 ("Voorhees Dep.") at 25, 27-32, 36.)

Plaintiff has submitted evidence that on August 25, 2014, Ravenscroft prepared and attempted to deliver a Corrective Action Record ("CAR") to Plaintiff.  (Ravenscroft

---

[3]    The inability to substantiate the sexual relationship was due to the lack of corroborating witnesses and the fact that Ravenscroft "vehemently denie[d]" the sexual relationship and any subsequent retaliation.  (Weiner Decl. ¶ 3, Ex. 5.)  Ravenscroft later admitted to the sexual relationship during his deposition.  (Ravenscroft Dep. at 57-61.) Plaintiff submits that had the sexual relationship been corroborated during Regus's investigation during the summer of 2014, Ravenscroft would have been terminated. (Edmundson Dep. at 194.)

Dep. at 128-29, 134.)  The CAR was based on an asserted drop in sales for Plaintiff in June and July 2014.  Plaintiff asserts that the CAR was not signed by Plaintiff or her supervisor and is not part of her HR records.  Despite being shown a copy of a document entitled "Corrective Action Record" listing him as the Supervisor for Pung (Weiner Decl. ¶ 7, Ex. 12), Ravenscroft testified that he could not recall the document or discussing Pung's performance in August of 2014.  (*Id.* at 128.)  Ravenscroft also stated that he could not imagine why he would have discussed her performance at this time "given the fact that this all happened, obviously, after she made a complaint and there was an investigation."  (*Id.*)

Several months later, in December 2014, Plaintiff was planning a client holiday party and she e-mailed Ravenscroft to ask if there was a formula for the amount of money that she could spend on such a party.  (Doc. No. 37, Ex. 23.)  Ravenscroft told Plaintiff that there was no specific budget, but to keep it under $250.  (*Id.*)  Plaintiff ended spending roughly $560 on the party and other holiday decorations.  (Ravenscroft Dep. at 195.)  Ravenscroft testified that he was monitoring the expense of the holiday party, thought it was getting expensive, and sent this information to Bowron.  (*Id.* at 204-05.) Ravenscroft also testified that Bowron asked for the information because he had mentioned "in a roundabout way" that there were some "outlier" charges in his region. (*Id.* at 196.)  According to Bowron, when he spoke to Plaintiff about the holiday party expenditures, Plaintiff told him that she did not think the budget was appropriate (the party was for 100 clients) and that she did not think she needed to follow the budget.

(Bowron Dep. at 98-100.)  Plaintiff argues that guidelines for this type of client spending were neither enforced nor generally known.  Plaintiff also submits that in addition to the party, she spent $150 of the $560 for poinsettias for the lobby.  (Pung Dep. at 300.)  Even so, on January 23, 2015, Bowron decided that Plaintiff should be placed on a Performance Improvement Plan ("PIP").  (Bowron Dep. at 151-52.)  This decision was based on Plaintiff's overspending on the holiday party.  Bowron testified that he was not aware of anyone else being placed on a PIP for holiday expenses.  (*Id*. at 153.)

On February 2, 2015, Regus implemented a Reduction in Force ("RIF").  (Edmondson Dep. at 146.)  Plaintiff's employment was terminated as part of the RIF.  (*Id*. at 176-77.)  Plaintiff points to evidence that the PIP factored into her termination and that the only reason she was on the PIP was the single incident of insubordination related to going over the holiday-party budget.

Plaintiff filed the present action in state court on December 14, 2015.  (Doc. No. 1, Ex. 1 ("Compl.").)  Defendant removed the case to this Court.  (*Id*.)  In her Complaint, Plaintiff asserts six claims:  (1) quid-pro-quo sexual harassment under the MHRA; (2) hostile work-environment harassment under the MHRA; (3) reprisal under the MHRA; (4) quid-pro-quo harassment in violation of Title VII; (5) hostile work-environment harassment in violation of Title VII; and (6) reprisal in violation of Title VII.

## DISCUSSION

### I.    Legal Standard

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Courts must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009).  However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  A party opposing a properly supported motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see also Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).

### II.    Judicial Estoppel

In April 2013, Plaintiff filed for Chapter 13 Bankruptcy in the United States Bankruptcy Court, District of Minnesota.  (Bankruptcy Case No. 13-31809.)  Plaintiff did not amend her bankruptcy filing to include her claim of discrimination against Defendant.

7

The bankruptcy court issued an order dismissing the case without prejudice in August 2015, and the case was ultimately closed in October 2015.  (Bankruptcy Doc. Nos. 24, 26.)  Plaintiff did not receive a discharge of any of her debts.

Defendant argues that Plaintiff's claims are barred by judicial estoppel because Plaintiff failed to disclose her employment discrimination claims during the bankruptcy proceedings.  Plaintiff, on the other hand, maintains that judicial estoppel should not apply because her bankruptcy case was dismissed without the discharge of debts. Judicial estoppel is an equitable doctrine that "prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding."  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citation omitted); *Van Horn v. Martin*, 812 F.3d 1180, 1182 (8th Cir. 2016).  Courts evaluate three factors when deciding whether judicial estoppel applies:  (1) whether the party's subsequent position is "clearly inconsistent" with a previous position; (2) whether the party succeeded in persuading the first court to accept its position; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage.  *Van Horn*, 812 F.3d at 1182 (citations omitted).  Failure to disclose employment discrimination claims during bankruptcy proceedings can result in the application of judicial estoppel in later proceedings.  *See, e.g.*, *Van Horn*, 812 F.3d at 1183 (affirming application of judicial estoppel; explaining that the "bankruptcy court adopted [plaintiff's] representations when it discharged . . . unsecured debt"); *Jones v. Bob Evans Farms, Inc.*, 811 F.3d 1030, 1032-34 (8th Cir. 2016) (same).

Here, however, Plaintiff's debts were not discharged, making the facts of this case more closely aligned with those in *Stallings v. Hussmann Corp.*, 447 F.3d 1041 (8th Cir. 2006). In *Stallings*, the Eighth Circuit held that judicial estoppel did not apply in a case where the plaintiff failed to amend his bankruptcy schedules to include FMLA claims against his employer and the bankruptcy court dismissed the case without discharging the plaintiff's debts. 447 F.3d at 1048-49. The Eighth Circuit explained that, even though the plaintiff took the inconsistent position in the bankruptcy court that no FMLA claim existed, there had been no judicial acceptance of the plaintiff's inconsistent position and the plaintiff would not derive an unfair advantage if allowed to bring its FMLA claims in a subsequent case. *Id*.

After weighing the relevant factors, the Court concludes that judicial estoppel should not apply here. Because the bankruptcy court dismissed Plaintiff's case without a discharge of debts, it cannot be said that there was judicial acceptance of an inconsistent position taken by Plaintiff. Nor has Defendant established that Plaintiff would derive any unfair advantage if allowed to bring the present discrimination claims.

III.    **Sexual Harassment**

Plaintiff asserts sexual harassment claims under both Title VII and the MHRA. Title VII makes it an "unlawful employment practice for an employer . . . to discriminate against any individual . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a). Similarly, the MHRA specifies that it is an unfair employment practice to discriminate against a person with respect to "hiring, tenure, compensation, termination, upgrading,

conditions, facilities, or privileges of employment" because of an employer's sex.  Minn.

Stat. § 363A.08, Subd. 2.  Plaintiff's MHRA claims are properly analyzed under the law

developed under Title VII.  *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th

Cir. 2011); *Bahr v. Capella Univ.*, 788 N.W.2d 76, 83 (Minn. 2010).

When analyzing indirect evidence of discrimination, courts apply the

burden-shifting framework promulgated in *McDonnell Douglas Corp. v. Green*, 411 U.S.

792 (1973).  *Torgerson*, 643 F.3d at 1046.  Under the *McDonnell Douglas* framework, if

Plaintiff is able to establish a prima facie case of discrimination, the burden then shifts to

Regus to produce a legitimate, non-discriminatory reason for the adverse employment

action.  *Id.*  If Regus is able to articulate such a reason, the burden then shifts back to

Plaintiff to produce evidence sufficient to create a genuine issue of material fact showing

that the proffered reason is merely a pretext for unlawful discrimination.  *Id.*  The

ultimate issue at this stage is whether Plaintiff can produce sufficient evidence that

unlawful discrimination was a motivating factor in Regus's decision to terminate

Plaintiff.  *Roberts v. Park Nicollet Health Servs.*, 528 F.3d 1123, 1127 (8th Cir. 2008).).

### A.    Quid Pro Quo

In Counts I and IV, Plaintiff alleges quid-pro-quo sexual harassment.  To establish

a prima facie case of quid-pro-quo harassment, a plaintiff must show that:  (1) she was a

member of a protected class; (2) she was subjected to unwelcome sexual harassment in

the form of sexual advances or requests for sexual favors; (3) the harassment was based

on sex; and (4) her submission to the unwelcome advances was an express or implied

condition for receiving job benefits or her refusal to submit resulted in a tangible job

detriment.  *See Cram v. Lamson & Sessions Co.*, 49 F.3d 466, 473 (8th Cir. 1995).

Defendant moves for summary judgment on this claim, arguing that Plaintiff

cannot establish a prima facie case of quid-pro-quo harassment.  First, Defendant

contends that Plaintiff relies on alleged harassing conduct by Ravenscroft contained in

e-mails that were sent before or during their consensual relationship.  Defendant points

out that Plaintiff mentions and refers to e-mails sent after she ended the relationship, but

does not cite to any such specific e-mails.  Second, Defendant asserts that Ravenscroft

did not threaten Plaintiff's position, seek sexual favors, or intimate that a failure to

engage in a sexual relationship with him would impact Plaintiff's employment.

Defendant also submits that the consensual nature of their relationship and lack of any

exercise of power by Ravenscroft precludes a claim for quid-pro-quo harassment.  Even

if Plaintiff could state a prima facie case, Defendant maintains that Plaintiff was

terminated as part of a lawful RIF.  Specifically, Defendant asserts that Plaintiff was

terminated based on objective standards established and implemented nationwide and,

while Plaintiff's PIP played a role in her being subject to the RIF, the PIP was not issued

in response to her complaints against Ravenscroft, but, rather, was the result of her failure

to follow a direct order on the holiday party budget from her supervisor.

Plaintiff argues that her termination was the direct result of Ravenscroft's

imposition of a budget for the holiday party and his subsequent complaint about Plaintiff

going over the budget.  Plaintiff submits that Ravenscroft was motivated to complain

about the expenditure because he was upset that Plaintiff refused to continue their sexual relationship and because she complained to HR about Ravenscroft's behavior. Plaintiff points to record evidence that when asked why he criticized Plaintiff in 2014, Ravenscroft stated "Why shouldn't I after the hell she put me through this summer?" (Weiner Decl. ¶ 8 ("Voorhees Decl.") ¶ 3; Voorhees Dep. at 73.)[4] The record establishes that Plaintiff complained to HR about Ravenscroft during the summer of 2014. In addition, Plaintiff submits that the holiday party budget issue was preceded by efforts on the part of Ravenscroft to target Plaintiff after she ended their relationship. Plaintiff cites to the following additional evidence to support a showing of discriminatory intent: (1) Ravenscroft came up with the $250 holiday party without relying on any specific company policy; (2) Plaintiff was the only employee who was disciplined for exceeding a party budget, despite the fact that other employees threw parties without strict budget constraints and Plaintiff had thrown similar parties in years past without incident; and (3) Regus has given differing accounts of why Plaintiff was terminated. Plaintiff cites to the above evidence in support of both her prima facie case and a showing of pretext.

The Court finds that, viewing the evidence in the light most favorable to Plaintiff, Plaintiff has pointed to evidence that could lead a reasonable juror to conclude that Plaintiff's refusal to continue a sexual relationship with Ravenscroft or her decision to complain to HR about Ravenscroft's alleged harassment factored into Ravenscroft's

---

[4]     Defendant takes issue with Plaintiff's citation to this fact, pointing out that Voorhees recanted that statement during his deposition. At most, this creates an inconsistency in his testimony that can be explored at trial.

treatment of Plaintiff. A reasonable juror could also conclude that Ravenscroft's treatment, and in particular his role in the issue regarding Plaintiff's holiday party expenditure, ultimately factored into Plaintiff's termination. This evidence supports Plaintiff's prima facie case. And accepting that Regus has articulated a legitimate reason for placing Plaintiff on a PIP (violating work rules) and for her termination (RIF), there nonetheless remain fact issues as to whether these actions were influenced by discriminatory animus on the part of Ravenscroft.

Plaintiff asserts that Regus is liable for the discriminatory and retaliatory actions of Ravenscroft under the "cat's paw" theory of liability. "In a cat's paw case, an employer may be vicariously liable for an adverse employment action if one of its agents—other than the ultimate decision maker—is motivated by discriminatory animus and intentionally and proximately causes the action." *See Bennet v. Riceland Foods, Inc.*, 721 F.3d 546, 551 (8th Cir. 2013) (citation omitted); *see also Zamora v. City of Houston*, 798 F.3d 326, 332-33 (5th Cir. 2015) (finding cat's paw analysis a viable theory of causation).

Defendant argues that Plaintiff mischaracterizes evidence in support of the "cat's paw" theory and that such a theory is unsupported by the record. In particular, Defendant argues that Ravenscroft did not take any action against Plaintiff and did not recommend that Plaintiff be disciplined. Instead, Defendant asserts that Bowron initiated the investigation into Plaintiff's holiday party expenditures, questioned Plaintiff, and determined that she was insubordinate. Defendant also asserts that Bowron made the

ultimate decision to place Plaintiff on a PIP, which ultimately factored into her termination via the RIF. Based on this, Defendant argues that Ravenscroft (and any discriminatory animus) was not the proximate cause of Plaintiff's termination and, thus, the cat's paw theory of liability should not apply.

Even accepting that Bowron was primarily responsible for Plaintiff's termination, the Court finds that there is sufficient evidence that Ravenscroft was motivated by retaliatory animus toward Plaintiff and that he took actions intended to cause Plaintiff to suffer an adverse employment action. Specifically, a reasonable juror could conclude that Ravenscroft played a material role in the sequence of events involving the holiday party expenditure, which in turn played a material role in Plaintiff's ultimate termination. Accordingly, the Court concludes that fact issues remain as to Ravenscroft's impact on the decision to terminate Plaintiff and denies Defendant's motion for summary judgment on Plaintiff's quid-pro-quo harassment claim.

### B.    Hostile Work Environment

In Counts II and V, Plaintiff asserts claims for hostile work environment sexual harassment. "Unlike *quid pro quo* sexual harassment . . . hostile work environment harassment arises when 'sexual conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.'" *Hall v. Gus Constr. Co., Inc.*, 842 F.2d 1010, 1013 (8th Cir. 1988) (quoting *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 66 (1986) (internal quotations omitted)). To prevail on a sexual harassment claim, Plaintiff must show that

14

"(1) she belongs to a protected group, (2) she was subject to unwelcome sexual harassment, (3) the harassment was based on sex, (4) the harassment affected a 'term, condition, or privilege' of employment, and (5) the employer knew or should have known of the harassment in question and failed to take proper remedial action." *Id.* While behavior creating the hostile working environment need not be overtly sexual in nature, it must be "'unwelcome' in the sense that the employee did not solicit or invite it, and the employee regarded the conduct as undesirable or offensive." *Id.* at 1014 (quoting *Moylan v. Maries Cty.,* 792 F.2d 746, 749 (8th Cir. 1986)). In addition, the harassment must be sufficiently severe or pervasive "to alter the conditions of employment and create an abusive working environment." *Meritor Sav. Bank,* 477 U.S. at 67 (citation omitted).

In support of her hostile work environment claims, Plaintiff argues that after she ended the sexual relationship, Ravenscroft's behavior was sufficiently severe and pervasive so as to alter her conditions of employment and that Regus failed to remedy the situation. Specifically, Plaintiff relies on her general factual allegations that Ravenscroft treated her poorly through e-mails and by criticizing her work, as well as the allegations supporting her quid-pro-quo claim. Defendant moves for summary judgment on this claim, arguing that Plaintiff's relationship with Ravenscroft was consensual, she was not subjected to a hostile work environment, and, in any event, Regus conducted an investigation after Plaintiff complained.

The Court concludes that, viewing the record evidence in the light most favorable to Plaintiff, no reasonable juror could conclude that Plaintiff's workplace interactions

with Ravenscroft after their consensual relationship ended constituted the type of sustained, severe harassment required to make a claim of hostile work environment. There is record evidence that Ravenscroft and Plaintiff interacted, argued, and that Ravenscroft criticized Plaintiff's work. This evidence, however, is insufficient, as a matter of law, to support a hostile work-environment claim. There is no evidence that Ravenscroft made physical contact with Plaintiff, used inappropriate language, or made sexual or intimidating comments to Plaintiff. Instead, the evidence shows that Ravenscroft may have been abrupt, critical, and sarcastic at times, but this behavior was not sustained so as to rise to the level of an abusive work environment.

For the reasons discussed above, the Court grants Defendant's motion for summary judgment on Plaintiff's hostile work-environment claims. Therefore, Counts II and V are properly dismissed.

## IV.    Retaliation

In Counts III and VI, Plaintiff asserts claims of retaliation or reprisal. Specifically, Plaintiff contends that she was retaliated against for complaining about sexual harassment in violation of 42 U.S.C. § 2000e-3(a), which prohibits an employer from discriminating against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter . . . [or made a] charge . . . in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (noting that Title VII forbids employer actions that "discriminate against" one who opposes an unlawful

16

practice).  Similarly, the MHRA prohibits retaliation against employees for reporting sexual harassment.  Minn. Stat. § 363A.15.

The Court analyzes Plaintiff's retaliation claims under the framework set forth under *McDonnell Douglas*.  Under that framework, a plaintiff must first establish a prima facie case of retaliation by demonstrating that she engaged in a protected activity, that she suffered an adverse employment action, and that there was a causal connection between the two.  *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1043 (8th Cir. 2007) (analyzing Title VII claims under burden-shifting framework); *Sieden v. Chipotle Mexican Grill, Inc.*, 846 F.3d 1013, 1016-17 (8th Cir. 2017) (explaining that reprisal claims under the MHRA are analyzed using the *McDonnell Douglas* framework).  If a plaintiff establishes a prima facie case, the burden shifts back to the employer to articulate a legitimate, non-retaliatory reason for its action, after which the burden shifts back to the plaintiff to point to evidence that creates a fact issue that the proffered reason was pretextual and that creates a reasonable inference that the defendant acted in retaliation.  *Stewart*, 481 F.3d at 1043.

The parties combine their discussions of Plaintiff's retaliation claims with the discussion of quid-pro-quo harassment, or at least the allegation that Plaintiff's termination was proximately related to her complaints lodged against Ravenscroft.  As explained above, Plaintiff has submitted evidence that could lead a reasonable juror to conclude that Ravenscroft complained about, raised, or used Plaintiff's expenditures for the 2014 holiday party budget in such a way that resulted in, or at least factored into, her

termination.  Plaintiff also points to evidence that, during the summer of 2014, she complained to HR about Ravenscroft's alleged harassment.  Defendant responds that Plaintiff was terminated as part of a lawful RIF and maintains that there is not a causal connection between Plaintiff's complaint and her termination.

While Plaintiff's HR complaint and her termination were separated by several months, which weakens the inference of any causal nexus, the Court still finds that, viewing the evidence in the light most favorable to Plaintiff, a reasonable juror could find a nexus between her complaint to HR and her termination.  Should a factfinder believe the evidence submitted by Plaintiff, that factfinder could conclude that Ravenscroft's actions played a role or influenced Plaintiff's termination and that Ravenscroft took those actions because Plaintiff complained to HR about his alleged harassment of her.  After careful consideration, the Court concludes that there are factual disputes surrounding Plaintiff's allegations of unlawful retaliation.  Again, while Defendant has articulated a legitimate reason for its actions, fact issues remain regarding pretext.  Therefore, the Court denies Defendant's motion as to Plaintiff's retaliation and reprisal claims.

## CONCLUSION

While Plaintiff's harassment and retaliation claims survive Defendant's motion for summary judgment because of existing issues of material fact, the Court notes these claims survive narrowly.  A victory at this stage of the litigation is no guarantee that Plaintiff will ultimately prevail at trial.  Indeed, Plaintiff's case rests on a small number of disputed facts and a jury could also reasonably resolve a number of those issues in

favor of Defendant.  For example, a reasonable view of the evidence could lead a jury to conclude that any alleged action by Ravenscroft was unrelated to and did not influence Bowron's decision to terminate Plaintiff via the RIF.  And if so, despite the evidence demonstrating that Ravenscroft was perhaps rude and unkind to Plaintiff after their relationship ended, a reasonable juror might conclude that his behavior was unconnected to Plaintiff's termination.  There are a number of reasons that both parties should consider reaching a settlement in this case, and the Court encourages the parties to discuss a resolution to further the interests of all parties.

## ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (Doc. No. [34]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

1.    Plaintiff's claims for hostile work environment harassment (Counts II and V) are **DISMISSED WITH PREJUDICE**.

2.    Plaintiff's claims for quid-pro-quo sexual harassment and retaliation (Counts I, III, IV, and VI) will proceed to trial.

Dated:  December 21, 2017          s/Donovan W. Frank
                                   DONOVAN W. FRANK
                                   United States District Judge